# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| GARY M., o/b/o KAREN M.,[1] | : |
| *Plaintiff,* | : |
| | : |
| V. | : Civil No. 3:20-CV-1152(OAW) |
| | : |
| COMMISSIONER OF SOCIAL SECURITY | : |
| *Defendant.* | : |

## <u>ORDER AFFIRMING DECISION OF THE COMMISSIONER</u>

Gary M. ("Mr. M." or "Plaintiff") brings this action on behalf of his deceased daughter, Karen M. ("Ms. M." or "Claimant"), to appeal the October 17, 2018, final decision issued by the Commissioner of the Social Security Administration ("Commissioner")[2] denying Claimant's application for Title II Social Security Disability benefits ("SSDI") and Supplemental Security Income benefits ("SSI").  Currently pending before the court are Plaintiff's Motion to Reverse the Decision of the Commissioner, ECF No. 20, and the Commissioner's Motion to Affirm that decision, ECF No. 23.  For the reasons set forth herein, the court **<u>DENIES</u>** Plaintiff's Motion, and **<u>AFFIRMS</u>** the decision of the Administrative Law Judge ("ALJ").

---

[1] The court will identify Plaintiff and Claimant as such, or as "Mr. M." or "Ms. M." in order "[t]o protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g) . . . ." *Melissa C. v. Kijakazi*, 2023 WL 154893, at *19 (D. Conn. Jan. 11, 2023) (citing Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021)).

[2] Pursuant to 42 U.S.C. §405(g), "[a]ny action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office."  Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021.  Pursuant to Fed. R. Civ. P. 25(d), Commissioner Kijakazi automatically is substituted as the named defendant.

I.    **LEGAL PRINCIPLES**

The Commissioner employs a five-step analysis when determining whether an individual is entitled to disability insurance pursuant to the Social Security Act.  *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  At step one, the Commissioner evaluates whether the applicant is engaged in "substantial gainful activity," and if they are so engaged, the application is denied.  *Id.*  If they are not so engaged, then the Commissioner proceeds to step two and determines whether the applicant has a medically severe impairment or combination of impairments.  *Id.* at 140–41.  Without such impairments, the application is denied.  *Id.* at 141.  If the applicant's impairment is severe, then the Commissioner proceeds to the third step, at which the Commissioner consults a list of impairments which are presumptively disabling (the "Listings"), and if the applicant's impairment matches, or "is equivalent to," a condition on that list, their application is granted.  *Id.*  If the applicant's impairment fails to satisfy the Listings, then the analysis proceeds to the fourth step, at which the Commissioner determines whether the applicant's impairment or combination of impairments prevents them from performing work they have performed in the past.  If not, then the application is denied.  *Id.*  If so, the Commissioner proceeds to the fifth and final step and determines whether there is any other work available in the national economy that the applicant could perform, given their impairment, "age, education, and work experience."  *Id.* at 142.  If so, then the application is denied, and if not, then the application is granted.  *Id.*

District courts may only set aside a disability determination if it is "based upon legal error or is not supported by substantial evidence."  *Moreau v. Berryhill*, 2018 WL 1316197, at *3 (D. Conn. Mar. 14, 2018) (quoting *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir.

1998)).  "Substantial evidence" means more than a scintilla of evidence, but it is an extremely deferential standard of review.  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012).  The standard is satisfied by "such *relevant* evidence as a *reasonable* mind might accept as adequate to support a conclusion."  *Id.;* (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)) (emphasis in original); *see also Johnson v. Berryhill*, 2019 WL 1430242, at *5 (D. Conn. Mar. 29, 2019).  In reviewing a disability determination, courts must examine the entire administrative record and "consider the evidence which fairly detracts from the administrative finding as well as that which supports it."  *Covo v. Gardner*, 314 F. Supp. 894, 899 (S.D.N.Y. 1970); *see also Snell v. Apfel,* 177 F.3d 128, 132 (2d Cir. 1999) ("To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.").

If the court finds that the Commissioner has applied an incorrect legal standard, or if there are significant gaps in the administrative record, the court may remand for further review by the Commissioner.  *See Lepak ex rel. Lepak v. Barnhart*, 206 F. Supp. 2d 389, 392 (W.D.N.Y. 2002) (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  But if the record contains "persuasive proof of disability. . . , the court may reverse and remand for calculation and payment of benefits."  *Id.*  Otherwise, the stringent burden, which is "even more [deferential] than the 'clearly erroneous' standard [of review]" demands that the Commissioner's decision be affirmed.  *See Brault*, 683 F.3d at 448 (quoting *Dickinson v. Zurko*, 527 U.S. 150, 153 (1999)).

## II.   BACKGROUND

### A.   Procedural History

In applications dated October 2013, Ms. M. applied for disability insurance benefits ("SSDI") and for supplemental security income ("SSI") pursuant to the Social Security Act, Transcript ("Tr.")[3] at 206, 208, but her claims were denied initially and on reconsideration. *Id.* at 92, 105, 122, 137.   After a February 11, 2015, administrative hearing, an ALJ concluded that she was not disabled and, therefore, that she was not entitled to either SSDI or SSI benefits.   *Id.* at 33.   Thereafter, the Appeals Council denied her request for review.   *Id.* at 1.

Claimant then filed a civil action, captioned *M. v. Berryhill*, Case No. 16-cv-10876-KAR (D. Mass.).   On December 9, 2016, based on an application filed July 5, 2016, the Social Security Administration found Ms. M. eligible for SSI as of July 2016.   Tr. at 817. After the United States District Court for the District of Massachusetts remanded the case, *id.* at 800, the ALJ's denial of benefits issued, effective March 17, 2015.   *Id.* at 782.   On April 6, 2018, the Appeals Council remanded the matter for a new hearing because in the hearing decision, the ALJ did not express Claimant's residual functional capacity ("RFC")[4] "in vocationally specific functional terms."   *Id.* at 812.

After a September 7, 2018 hearing at which Claimant appeared and was represented by counsel, another ALJ issued an unfavorable decision.   *Id.* at 660—76.

---

[3] In accordance with the court's Standing Order in Social Security Cases, the court will refer to the Transcript page numbers, rather than those generated by the CM/ECF System (at ECF No. 15).   Standing Order – Social Security Cases, III. f. (D. Conn. Dec. 19, 2022)).

[4] The RFC is a multi-factor designation used in disability proceedings to indicate an individual's capabilities and limitations.   *Roat v. Barnhart*, 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010).   It is used to determine what, if any, jobs in the national economy an applicant could perform.   *Id.*

On October 30, 2018, Ms. M. passed away from "cardiopulmonary arrest" and "acute myocardial infarction." *Id.* at 947. The Appeals Council found no reason to assume jurisdiction, *id.* at 638,[5] and, therefore, the ALJ's October 17, 2018, decision is the final decision of the Commissioner in this matter. Mr. M., on behalf of his daughter, now seeks judicial review pursuant to 42 U.S.C. § 405(g).

But before taking up such review, the court pauses to express its condolences to Plaintiff, fully acknowledging that Ms. M. is more than can be represented through documents from two hearings before an ALJ and a compilation of medical records. That reality is never lost on the court as it carries out its legal obligations.

### B.    Medical Facts

Ms. M. was born on July 6, 1972, and she was a high school graduate. *Id.* at 44. Her work history includes a number of jobs in retail (including managerial positions), *id.* at 45—46, and her medical history contains various occasions on which she sought and received treatment for a number of conditions.

#### 1.  *Bristol Hospital*

In October 2008, she was admitted to Bristol Hospital, and was diagnosed with major depressive disorder. *Id.* at 555. The discharge summary indicates that she was "dealing with some medical problems including diabetes, back problems and problems with cervical carcinoma." *Id.* Ms. M. "[had] been on Lexapro since 1991 after her divorce" and the dosage was increased upon admission.[6]

---

[5] The Appeals Council initially dismissed the claimant's exceptions because there was "no survivor or other qualified person adversely affected who wishes to proceed with the request for review." *Id.* at 647. Subsequently, the Appeals Council set aside its dismissal and concluded that Mr. M. was "a qualified substitute party." *Id.* at 637.

[6] Upon discharge, Ms. M. "was completely improved with no symptoms of depression and appeared to no longer be suicidal." *Id.* The day of her discharge, however, she was readmitted. Id. at 545. Upon her return home from the hospital, there were individuals in her house and she "got angry" because her "pain

In 2010 and 2011, Ms. M. subsequently received outpatient therapy at Bristol Hospital. *Id.* at 328—30. She reported doing "well" and having "OK" relationships, with no symptoms of depression. *Id.* at 329. A September 2011 discharge summary from the Counseling Center at Bristol Hospital ("Center") indicated Ms. M. was being discharged from the program because she had not attended therapy since June, and had not responded to communications from the Center. *Id.* at 331.

### 2. *Valley Psychiatric Services*

Between May 2012 and June 2014, Ms. M. received mental healthcare at Valley Psychiatric Services ("VPS"). *Id.* at 426—38; 461—85. She "report[ed] she [had] not been on medications to treat previous diagnoses of Anxiety or Depression" and was experiencing "extreme mood swings, . . . [and] feeling helpless over her own current life circumstances." *Id.* at 464. An October 2012 Mental Status Examination indicated that she was "physically unkept;" her eye contact, speech, perception, thought content and process, intellectual functioning, orientation, insight, memory and judgment were within normal limits; she had slumped posture and slowed movement; she was cooperative, but nervous/anxious; she lacked feelings with a "blunted, unvarying" mood and "constricted affect" with "sleep disturbance;" and her facial expression was "unvarying." *Id.* at 469. Ms. M. noted that she had been seeking employment without success since she was laid off in 2010, and had not taken psychiatric medication since February 2012. *Id.* at 470. She and reported a "history of compulsive spending"[7] and examples of her anger and aggression. *Id.* Ms. M. also reported that she feared large crowds, was "jittery when in

---

pills were stolen." *Id.* When she held a knife to her stomach, her boyfriend called 911 and Emergency Medical Services ("EMS") escorted her back to the hospital. *Id.* She denied suicidal ideation to police, to EMS, and to a triage nurse. *Id.*

[7] The assessment indicates that she had filed for bankruptcy. *Id.*

large Department stores due to a near assault by [a] customer in 2009," was isolated, did

not like to leave home, had no structure to her daily schedule, was unemployed, had

"decreased contact with family members," was "financially depressed," had extreme

mood swings, feared returning to work because of the aforementioned near assault, was

sleeping 12—16 hours per day, and had a history of cutting herself at age fifteen.  *Id.* at

471—472.  Ms. M. was assigned a Global Assessment of Functioning ("GAF") score of

50.  *Id.* at 473.[8]

November 2012, February 2013, and May 2013 records from Valley Psychiatric

Services indicated no abnormal findings upon Ms. M.'s mental examination.  *Id.* at 428—

29, 431.  Claimant indicated that her medications were helping her symptoms.  *Id.* at 428,

431.  She stated that she continued to seek employment.  *Id.* at 429.

A June 17, 2014 Valley Psychiatric Services Discharge Summary indicated that

Ms. M. was diagnosed with Bipolar I Disorder.  *Id.* at 462.  The Summary states that Ms.

M. "was cooperative and engaged well during the session" and that she discontinued

treatment because she needed to change to another provider, identified as "BMC," due

to a weight loss program and anticipated gastric bypass surgery.  *Id.* at 462.

### 3.  *Dr. Daniel Chapelle*

On August 9, 2012, Licensed Clinical Psychologist/Health Service Provider, Daniel

Chapelle ("Dr. Chapelle"), evaluated Ms. M. "to help assess her cognitive, emotional, and

behavioral functioning."  *Id.* at 332.  He performed a number of tests.  Dr. Chapelle

---

[8] "A GAF score was historically used to reflect the clinician's judgment of an individual's overall level of functioning, not including impairments due to physical or environmental limitations."  Plaintiff's Statement of Fact, ECF No. 20-2 at 10 n.1 (citing American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Revision 2000) (DSM-IV-TR at 34).  Further, "[a] GAF score of 41 to 50 indicated serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." *Id.* (citing DSM-IV-TR at 34).

observed that she was dressed and groomed appropriately; was cooperative; her eye contact was good; she was somewhat anxious; she did not have any difficulties understanding and following instructions; she had normal speech; she sustained good attention and concentration with no distractibility; she had logical, organized, and goal directed thought process; and her IQ score was 78.  *Id.* at 333—34 (Dr. Chapelle's Assessment).  He assessed her intellectual functioning and working memory "to be consistently in the borderline to low average range."  *Id.* at 334.  He reported weakness in Ms. M.'s vocabulary, general knowledge, understanding of social behaviors, auditory attention and recall, concentration and short-term memory control, and ability to interpret large quantities of data for recurring cues.  *Id.* at 334—35.  Dr. Chapelle noted "pronounced weakness . . . in her ability to recognize recurring visual patterns among complex designs."  *Id.* at 335.  Finally, according to Dr. Chapelle, her "avoidance of affect . . . made Ms. M. vulnerable for anxiety, emotional lability, an overall lack of emotional self-awareness, and an overall lack of sufficient coping skills to navigate the emotional and interpersonal ambiguities of everyday life.  *Id.*  His diagnosis included "Bipolar Disorder Depression Anxiety Disorder NOS[9] and Rule out: Panic Disorder with Agoraphobia," and he assessed a GAF score of 50.  *Id.* at 336.  Dr. Chapelle recommended continued access to psychiatric medication and treatment and to individual psychotherapy, possibly including joint meetings involving her boyfriend, but he did not evaluate Ms. M.'s functional limitations.  *Id.* at 336—37.

### 4.  Arthritis Treatment Center

---

[9] NOS represents an abbreviation for "not otherwise specified."  *See* ECF No. 20-2 at 18.

In December 2012, rheumatologist C. Bruce Tallman, Jr., M.D., diagnosed[10] Ms. M. with asymmetrical polyarticular inflammation.[11]   *Id.* at 458.   He noted normal upper extremity strength and no weakness in her lower extremity.   *Id.*   Other than "crepitus in both knees without effusion or tenderness," the exam was unremarkable.   *Id.*   He prescribed prednisone, and in January 2013, noted that she was "doing well."   *Id.* at 455. In a September 2013 note, Dr. Tallman observed that despite Ms. M.'s pain in her fingers and toes, she was able, "with some difficulty" to get dressed, to get into and out of bed, to take an outdoor walk on flat ground, to wash and dry herself, to bend down in order to pick up clothing, to turn on and off taps and to get into and out of a vehicle.   *Id.* at 348.   At that time, she had a body mass index ("BMI") of 44.1.   *Id.* at 349.   Dr. Tallman again noted crepitus in both of her knees, but she had full-range of motion in her fingers, wrists, elbows, knees, and ankles.   *Id.* at 349—50.   She had no upper nor lower extremity weakness and a normal affect.   *Id.* at 350.   Dr. Tallman advised her to continue on her current medications and to lose weight.   *Id.*

### 5.   Additional Assessments and Providers

Also in December 2012, State agency medical consultant Robert B. McGan, MD ("Dr. McGan") found that that Ms. M. had an RFC (residual functioning capacity) that allowed her to perform light work, with the limitation that only occasionally could she climb ladders/ropes/scaffolds.   *Id.* at 87—88.   In Dr. McGan's opinion, Ms. M.'s functional limitations were attributable to diabetes, obesity, hypertension and fatigue.   *Id.* at 85, 88.

---

[10] He initially examined her in May 2012.  *Id.* at 416.

[11] "Polyarticular joint pain involves five or more joints and can be inflammatory or noninflammatory. Two of the most common causes of chronic polyarthritis are osteoarthritis."   Polyarticular Joint Pain in Adults: Evaluation and Differential Diagnosis, AMERICAN FAMILY PHYSICIAN, 2023 Jan. 1; 107(1): 42-51 (available at https://www.aafp.org/afp/2015/0701/p35.html) (last visited Jan. 20, 2023).

In October 2013, Susann-Nicole G. Schwarz, LHHC ("Ms. Schwarz"),[12] described Ms. M.'s mental status as "flat affect + restricted emotional state, often reports severe emotional reactivity, suicidal ideation." *Id.* at 354.  Ms. Schwarz noted that, Ms. M. was not able to sustain concentration and attention for sustained periods, she experienced "emotional reactivity that [was] uncontrollable at times," and that she did not handle stress well.  *Id.* at 354—55.  In her prognosis, Ms. Schwarz noted that Ms. M. suffered from "[s]erious symptoms and serious impairment in social + occupational settings" and "[w]ould need to remain on medication [and] continue therapy or she will be unable to manage her symptoms for 12+ months (potentially for years)."  *Id.* at 356.

Ms. M.'s Social Security Function Report ("Function Report") from that timeframe indicated that she did not have problems with personal care (with reminders from her fiancé to take a shower) and that she did the dishes, drove, shopped for groceries, paid bills and managed a savings account; and attended church.  *Id.* at 262—65.  She indicated that she was able to walk less than a half of a mile, had trouble finishing what she started, had to review written instructions a few times and had difficulty following spoken instructions, did not have a problem with authority figures and had not lost a job due to issues getting along with others, had difficulty with stress and change, and feared "large crowds [and] yelling."  *Id.* at 267—68.  In a contemporaneous Third-Party Function Report, her mother, Deborah M., confirmed Ms. M.'s abilities with respect to her daily activities.  *Id.* at 271—78.[13]  Her Mother noted that Ms. M.'s fiancé did a majority of the

---

[12] The document is co-signed by Aaron Leavitt, M.D. ("Dr. Leavitt"), as Ms. Schwarz was "not an M.D. or licensed psychologist."  *Id.* at 356.
[13] She confirmed that Ms. M. had no issues with grooming but also stated, contrary to Ms. M.'s own report, that she did not need any reminders with respect to personal care.  *Id.* at 272—73.

cooking and helped with chores, but Ms. M. microwaved daily meals.  *Id.* at 273.  That Report also confirmed many of the difficulties noted in Ms. M.'s Report.  *Id.* at 276—77.

In November 2013, her primary care doctor, Uma Changanti, M.D. ("Dr. Changanti"), noted that Ms. M.'s glucose levels were high and her BMI was 42.34.  *Id.* at 380.  In December 2013, Claimant saw nurse practitioner Dalisay N. Singh ("NP Singh") to address her diabetes and NP Singh diagnosed "uncontrolled Type II diabetes, obesity, hypertension, and hyperlipidemia."  *Id.* at 500.  NP Singh discussed the role of diet, exercise and medication in relation to Ms. M.'s diabetes and advised that she "[c]ontinue to work on eating healthy [and] keeping active."  *Id.*

In March 2014, a state agency psychological consultant, Peter Robbins, Ed.D. ("Dr. Robbins"), concluded that Ms. M.'s severe affective and anxiety disorders resulted in mild restrictions on her activities of daily living; moderate difficulties in social functioning, concentration, persistence or pace; and he found no repeated episodes of decompensation of extended duration.  *Id.* at 115—16.  In his opinion, she could sustain adequate pace, persistence, and concentration for simple work tasks, and she was "not significantly limited" in her "ability to get along with coworkers . . . without distracting them or exhibiting behavioral extremes," nor in her ability to maintain appropriate social behavior in a work setting.  *Id.* at 120.

In April 2014, a state agency medical consultant, S. Ram Upadhyay, M.D. ("Dr. Upadhyay"), attributed Ms. M.'s functional limitations to morbid obesity and to poorly-controlled diabetes.  *Id.* at 118.  In his opinion, Ms. M. occasionally could lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; occasionally climb ramps, stairs,

ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and should avoid concentrated exposure to hazards.  *Id.* at 117—19.

Throughout 2014, Ms. M. saw Dr. Tallman and Dr. Singh.  Dr. Tallman continued to assess asymmetrical polyarticular inflammation with full range of motion in her joints.  *Id.* at 387—88.  Dr. Singh noted that Ms. M.'s diabetes was not well-controlled and suggested Ms. M. work on her diet and keeping active.  *Id.* at 497.  Progress notes from July 2014 indicated that Ms. M. was "[c]onsidering gastric bypass" surgery.  *Id.* at 489.

In June 2014, a provider at the Center for Psychological and Family Services ("CPFS"), Renee Huggins, MSW, diagnosed Ms. M. with "Depressive Disorder NOS, Generalized Anxiety Disorder, [and] PTSD Chronic," and noted a GAF of 57.[14]  *Id.* at 504, 513.  With the exceptions of being overweight with a slumped posture and slowed body movement, and a "depressed mood and constricted affect," Ms. M.'s Metal Status Examination revealed normal results.  *Id.* at 509.  She reported reading, attending church, continuing to search for employment, interest in returning to school and regular walking.  *Id.* at 506, 510, 512.  She also noted an "arrest for assault, road rage, physical abuse."  *Id.* at 510.

On October 31, 2014, licensed psychologist, Barbara McKim, Ph.D. ("Dr. McKim"), indicated that an IQ Score of 78 fell in the 7th percentile.  *Id.* at 635.  According to Dr. McKim, "the Full Scale IQ score is apt to be most closely commensurate with general learning ability, as it assesses aspects of both verbal and performance abilities."  *Id.* at 898.

---

[14] A GAF score between 51 to 60 indicates moderate symptoms. *See* DSM-IV-TR, at 34.

A December 16, 2014 CPFS Discharge Summary assessed Ms. M. with a GAF of 57. *Id.* at 564. Claimant indicated that she had joined and was attending a gym in order to prepare for gastric bypass surgery and was continuing to see a psychologist in connection with that surgery. *Id.* CPFS was closing her case because she was "relying on her support system for her needs and ha[d] since been unresponsive to attempts to contact her." *Id.*

In February 2015, Ms. M. testified at a hearing before an ALJ, that she was not able to work because she suffered from anxiety, bipolar disorder, depression, arthritis, cysts in her back, and tendonitis in her right arm and shoulder. *Id.* at 47. During the hearing, a vocational expert testified that if a hypothetical employee had a general learning and a verbal aptitude in the bottom ten percent, would "be discrepant from the aptitudes" associated with the jobs of surveillance system monitor and information clerk. *Id.* at 72—77.

An April 2015 assessment at Liberty Street indicated impairment in concentration and recent memory, but was otherwise unremarkable. *Id.* at 1005—06.

In November 2016, a counselor, Michelle Colglazier, M.Ed. "(Ms. Colglazier"), reported that she had been seeing Ms. M. on a bi-weekly basis since April 2015. *Id.* at 990. She stated that Ms. M.'s medications included Ambien, Trileptal, Wellbutrin XL, and Lorazepam, and noted that side effects of those medications included dizziness, fatigue, and lethargy. *Id.* In the description of her clinical findings, Ms. Colglazier stated that Ms. M. "has been experiencing significant depression, aggression [and] anxiety that has left her unable to leave the house most days." *Id.* Despite her attempted return to work, Ms. M. "was unable to maintain her position due to physical pain as well as flashback[s] of

past trauma in the workplace." *Id.* Ms. Colglazier, indicated that Ms. M. had "[n]o useful ability to function" with respect to multiple elements of unskilled work due to anxiety and depression. *Id.* at 992—94. Specifically, Ms. Colglazier noted Ms. M.'s inability to maintain good attendance, remain clear and level headed, manage aggression, concentrate and remain focused on tasks, and avoid being absent from work more than four days per month. *Id.* at 993—94.[15]

At the hearing before the ALJ on September 7, 2018, Ms. M. testified that, during the relevant period, she was most limited by pain in her arms, feet, and lower back, as well as by PTSD and anxiety. *Id.* at 700. She stated that she stopped working in 2009 after an incident at work caused traumatic stress and caused her to frequently miss work at that time. *Id.* at 697—98, 706—09. During the hearing, a vocational expert testified that a hypothetical individual of Ms. M.'s, age, education, work history, and RFC could perform light work as an office cleaner, price marker, and sub-assembler of electronics. *Id.* at 719—20, 722—24. That expert further testified that a limitation to only occasional reaching would eliminate all of those occupations. *Id.* at 725—26. He testified, "I've had individuals with cognitive limitations learn these jobs in a matter of minutes." *Id.* at 727.

**C.    ALJ's Decision**

The ALJ considered "the period of the alleged onset date January 1, 2009, through the day prior to her being found disabled, June 30, 2016." *Id.* at 661. He found that Claimant met the Social Security Act's insured requirements; that she was not engaged in "substantial gainful activity" at step one; that she had a medically severe combination

---

[15] At this time, Ms. M. was receiving SSI pursuant to the Social Security Administration's determination that she was eligible as of July 5, 2016. *Id.* at 817. This assessment was outside the period considered by the ALJ ("alleged onset date January 1, 2009, through day prior to her being found disabled June 30, 2016."). *Id.* at 661.

of impairments at step two (specifically, "asymmetrical polyarticular inflammation; obesity; depression; anxiety; a bipolar disorder; and post-traumatic stress disorder");[16] that her impairments were not presumptively disabling under the Listings at step three; that she retained an RFC for light work with limitations including that she "could occasionally balance, stoop, kneel, crouch, and crawl . . . could perform simple, routine tasks . . . [and] could have occasional contact with supervisors and coworkers, and incidental contact with the public;" that she could not return to her previous work as a "front end manager" or "assistant manager" at step four; but, at step five, relying on vocational expert testimony, that there was other work in the national economy that she still could perform, including "[a] sub-assembler of electronics . . . ; [a]n office cleaner . . . ; and . . . [a] price marker." *Id.* at 663—675. Therefore, the ALJ concluded that Ms. M. did not fall within the Social Security Act's definition of disabled during the period at issue, and denied her application. *Id.* at 676.

In determining Ms. M. had an RFC to perform "light work,"[17] with respect to her physical limitations, the ALJ considered Claimant's own testimony which included her stated level of her pain and her regular activities. *Id.* at 668. The ALJ also noted Ms. M.'s report of arthritic pain and medical assessments indicating "intermittent[] . . . diffuse tenderness of the hands and feet, along with crepitus of the knees, some lower back spasms, and a reduced range of back motion[,]" in addition to one occasion on which she displayed a "wide-gait." *Id.* at 669. He stated, however, that "despite these findings, treatment records reflected that she often appeared to be in no distress . . . and expressed

---

[16] The ALJ found that Ms. M.'s diabetes, hypertension, and right clavicle fracture, while medically determinable, did not present "more than a minimal limitation in [her] ability to perform basic work activities." *Id.* at 664.
[17] *See* 20 C.F.R. § 404.1567(b).

no complaints of body pain." *Id.* The ALJ cited medical records, including assessments from treating rheumatologist Dr. Tallman, noting "a normal gait and station," normal joints, full-range of motion in her fingers, elbows, and knees, and full strength in her upper and lower extremities. *Id.* He found that her Level III obesity,[18] when considered in combination of her other listed impairments was "severe" and "could be expected to limit her exertional abilities and exacerbate the symptoms from her other physical conditions . . . ." *Id.*

With respect to her mental impairments, the ALJ noted Ms. M.'s prior history of depression, anxiety, and hospitalization. *Id.* at 669—70. He recognized her continued complaints of depression and anxiety and IQ score of 78, "indicating borderline-to-low average intelligence." *Id.* at 670. While he noted records indicating Ms. M.'s "depressed mood," "unkept appearance," "flat affect with a restricted emotional range," and one report of her "impaired recent memory," the ALJ cited additional records during the period in question in which she was "doing well" and that treatment had helped her symptoms. *Id.* Specifically, she was "cooperative with normal behavior, normal intellectual functioning, normal memory abilities, normal insight and judgment, and a logical thought process." *Id.* Records indicated that "she often appeared friendly and engaged . . . [,] had no difficulties understanding following [sic] test instructions . . . [,] displayed good attention and concentration . . . [,] showed no distractibility . . . [,] displayed a normal affect with appropriate grooming" and addressed her symptoms with medication and therapy. *Id.*

---

[18] The ALJ cites Clinical Guidelines for the proposition that a BMI of 40.0 and above equates to a Level III of that condition and "represents the greatest risk for developing obesity-related impairments." *Id.* at 669 n.1.

The ALJ greatly relied upon the opinions of agency consultants, Drs. McGan and Upadhyay because their findings were consistent with the medical evidence of record. *Id.* at 670.

In terms of opinion evidence from Ms. M.'s treating providers, the ALJ partially relied upon Drs. Leavitt and Chapelle, who were medical providers and treating sources. *Id.* at 671.  The ALJ noted that each of them failed to provide a functional assessment of Ms. M.'s abilities. R. 671—672.  Similarly, he partially relied upon Dr. Leavitt with respect to Ms. M.'s social and occupational interactions, her ability to communicate and to deal with stress, her concentration, her attention, and her ability to remember.  *Id.* at 671.  He found that while the record evidence is consistent with Dr. Leavitt's findings regarding some of Ms. M.'s limitations, the evidence was not consistent with the degree of limitation assigned by Dr. Leavitt.  Additionally, the ALJ noted that Dr. Leavitt neglected to provide a complete functional assessment, and "failed to support his conclusions with objective medical findings . . . [; also that his] conclusions . . . appear[ed] inconsistent with the claimant's documented ability to complete daily activities . . . ."  *Id.*  Finally, the ALJ partially credited psychological examiner Daniel Chappell, who assigned Ms. M. an IQ of 78 and noted that she "tended to avoid others . . . and . . . to avoid sustained effort."  *Id.* According to the ALJ, Dr. Chappell's conclusions "suggest some impairment in [Ms. M.'s] ability to understand or apply information and her limitations in interacting with other[s]", but his "failure to provide a functional assessment . . . limits the usefulness of his opinion in evaluating [her] functional abilities."  *Id.* at 672.

The ALJ afforded "little weight" to the opinion of Ms. Colglazier and to the statement of Ms. M.'s mother (Deborah M.), finding the "extreme level of limitation" that Ms.

17

Colglazier assigned to be inconsistent with the evidence of record and not supported "with objective medical findings."  *Id.*  Similarly, the ALJ found Deborah M.'s statement also to be inconsistent with the record and, additionally, that the value of her statement further was diminished because she was "not a medical provider or an uninterested party . . . ." *Id.* at 673.


### III.    DISCUSSION

Plaintiff makes three arguments on appeal of the ALJ's decision.  With respect to RFC, Plaintiff argues that the ALJ relied on the state agency consultants' opinions to an improper extent due to Plaintiff's claim that the consultants' findings failed to "take asymmetrical polyarticular inflammation and its associated limitations into account." Plaintiff's Memorandum, ECF No. 20 at 5.  According to Plaintiff, Dr. Upadhyay failed to "consider the limitations resulting from Ms. M.'s inflammatory arthritis" and "he did not consider any limitations caused by pain."  Plaintiff's Reply, ECF No. 26 at 2.  Plaintiff next argues that the ALJ's articulation of Ms. M.'s RFC is invalid because it is "internally inconsistent."  *Id.* at 6.  Specifically, Plaintiff notes that the ALJ found Ms. M. capable of light work, but included a limitation of only occasional balancing.  *Id.* at 6—7.  Finally, Plaintiff argues that because Ms. M.'s IQ score put her in the lowest ten percent, her general learning ability is inconsistent with the Department of Labor's ("DOL") ratings for the jobs upon which the ALJ relied.  *Id.* at 11.

Defendant responds that although the agency consultants did not mention Ms. M.'s inflammatory arthritis, they acknowledged corresponding limitations on her agility based on her morbid obesity and diabetes.  Defendant's Memorandum, ECF No. 23-1 at 5.

Defendant notes that the agency consultants' opinions, combined with other evidence of record, provide the requisite substantial evidence in support of the ALJ's RFC determination.  *Id.* at 5—7.  With respect to an alleged inconsistency in the ALJ's RFC, Defendant avers that Plaintiff's argument amounts to "an erroneous interpretation of the vocational resources."  *Id.* at 10.  Finally, Defendant argues in opposition that Ms. M.'s IQ was but one factor the ALJ considered in properly identifying jobs she could perform.  *Id.* at 8—9.

A.      **Residual Functional Capacity**

*1. Reliance on Agency Consultants & Necessity of Additional Evidence*

Because this claim was filed prior to the March 27, 2017, revision to the applicable regulatory scheme,[19] the ALJ evaluated the medical opinions with respect to the factors set forth at 20 C.F.R. § 404.1527, which establishes the level of reliance to be applied to treating medical professionals.  20 C.F.R. § 404.1527(c)(2).  However, the regulation further provides that an ALJ may consider other medical source opinions that are consistent with the record.  See 20 C.F.R. § 404.1527(c)(4); *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008).

In concluding that Ms. M. had an RFC to perform light work, the ALJ limited her to only occasionally "climb[ing] ramps and stairs, ladders, ropes, and scaffolds, and . . . balanc[ing], stoop[ing], kneel[ing], crouch[ing], and crawl[ing]."  Tr. at 667.[20]  In doing so, the ALJ relied on state agency consultants, Dr. Upadhyay and Dr. McGan, and gave their

---

[19] *See* 20 C.F.R. § 404.1527(c)(2) (2017) ("For claims filed . . . before March 27, 2017, the rules in this section apply."). For claims filed on or after March 27, 2017, the court applies the provisions of 20 C.F.R. § 404.1520c.  *Id.*

[20] The ALJ also found that Ms. M. "could occasionally lift and carry 20 pounds, and frequently lift and carry 10 pounds."  *Id.*  Further, he found that she could "stand and walk for six hours in an eight-hour day, and sit for six hours in an eight-hour day."  *Id.*

opinions "significant weight" because their findings were consistent with the evidence of record. *Id.* at 670. The court agrees that the agency consultants' opinions were consistent with the evidence in this case. Specifically, Dr. Upadhyay's finding that Ms. M.'s obesity and "poorly controlled" diabetes would limit her postural capabilities, *id.* at 118, is consistent with a treatment note from Ms. M.'s treating rheumatologist, Dr. Tallman, who recognized the role that her weight played in her medical conditions. *Id.* at 416, 446. Plaintiff finds significance in the fact that although the ALJ found asymmetrical polyarticular inflammation to be a severe impairment and relied on the state agency consultants' opinions in finding an RFC of light work, with limitations, the consultants never specifically relied on that condition. In a reply brief, Plaintiff suggests that the ALJ should have "contacted an acceptable medical source, ordered a consultative examination, or had a medical expert testify at the hearing." ECF No. 26 at 4.

The Second Circuit has recognized that if "an ALJ fails in his or her duty to request opinions or assessments to develop the record, remand is not required when 'the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity.'" *Laflamme v. Berryhill*, 2019 WL 1786045, at *4 (D. Conn. Apr. 24, 2019) (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013)). In *Tankisi*, the Second Circuit held that remand for development of the record was not required because although the medical record did not contain a treating physician's formal opinion regarding the claimant's RFC, the record was "quite extensive," and did include a treating source's assessment of the claimant's limitations and consultative examiners' functional assessments. *Tankisi*, 521 F. App'x at 34. "'The critical point' is that the claimant's medical records must contain 'the sorts of nuanced descriptions and

assessments that would permit an outside reviewer to thoughtfully consider the extent and nature' of her impairments and 'their impact on her RFC.'"  *Vecchitto v. Saul*, 2020 WL 4696791, at *4 (D. Conn. Aug. 13, 2020) (quoting *Sanchez v. Colvin*, No. 2015 WL 736102, at *8 (S.D.N.Y. Feb. 20, 2015)).  The medical records must do more than state the claimant's ailments and treatment for them, without any "insight into how her impairments affect or do not affect her ability to work, or her ability to undertake her activities of everyday life."  *Guillen v. Berryhill*, 697 F. App'x 107, 109 (2d Cir. 2017) (summary order).  It is the record's failure to provide such insight that generally will precipitate the ALJ's duty to request a medical source statement.  *Vecchitto*, 2020 WL 4696791, at *4 (quoting *Guillen*, 697 F. App'x at 109).

In the present case, the record contains multiple assessments of Ms. M.'s physical capabilities throughout the period in question, including those of her treating rheumatologist, Dr. Tallman, and agency consultants, Drs. Upadhyay and Dr. McGan. While an ALJ, himself, cannot make the connection between a medical diagnosis and a claimant's functional capacity, *Laflamme*, 2019 WL 1786045, at *3 (D. Conn. Apr. 24, 2019), here, the ALJ properly considered the applicable regulatory factors and explained the relationship between Ms. M.'s polyarticular inflammation (evidenced by her joint pain) and her RFC.  Specifically, the ALJ acknowledged and addressed her reports of arthritic pain by limiting Ms. M. to light work with limitations.  Tr. at 669—70.[21]  It is true that the

---

[21] Although Plaintiff does not specifically argue that the ALJ failed to properly assess Ms. M.'s credibility, the court notes that such a determination is within the ambit of the ALJ's review.  *See Selian v. Astrue*, 708 F.3d 409, 421—22 (2d Cir. 2013).  The ALJ properly assessed Ms. M.'s complaints of pain juxtaposed against the evidence in the medical record.  Specifically, as stated herein, *infra* at 22—23, Ms. M. regularly presented to her treating rheumatologist with normal ranges of motion and strength in her extremities, Tr. at 349-50, 388, 416, 596, examinations of her joints, bones, and muscles were routinely normal, *id.* at 341, 583, 606, 615, and despite exhibiting a "wide-gait" one occasion, *id.* at 606, records indicate that her gait generally was normal.  *Id.* at 341, 378, 488, 497.  The record also indicates that Prednisone helped to

consultants did not specifically acknowledge "polyarticular inflammation" as an impairment, but they noted that Ms. M.'s obesity and poorly-controlled diabetes, together with fatigue, could be expected to limit her physical agility; thus they acknowledged a limitation of her RFC to light work. *Tr.* at 87—88, 117—19. The court concludes that any error in the ALJ's reliance on the consultants' respective findings (based on their failure to specifically note Ms. M.'s inflammatory arthritis) was harmless, because the consultants acknowledged corresponding limitations in Ms. M.'s physical agility and abilities relative to her obesity, her diabetes, and her fatigue, Dr. McGan's Findings, Tr. at 85—88; Dr. Upadhyay's Findings, Tr. at 117—19, all of which are consistent with the assessments of her treating rheumatologist concerning the impact of her weight on her medical conditions. Dr. Tallman's Assessments, Tr. at 416, 446.

The progress notes in this case, coupled with the state agency consultants' findings, contain adequate assessments in relation to Ms. M.'s work-related capabilities such that the ALJ was not required to further develop the record with respect to her polyarticular inflammation. *See Sena v. Berryhill*, 2018 WL 3854771, at *14 (D. Conn. Aug. 14, 2018) (excusing lack of opinion from treating physician because 1,432-page record otherwise contained "ample information upon which to base the RFC determination"). *But see Mirna C. v. Kijakazi*, 2022 WL 4285694, at *5 (D. Conn. Sept. 16, 2022) (remanding where although the record contained diagnosis and treatment information, it "[did] not contain any information as to how those ailments affect her ability to perform the physical demands of work"); *Alamo v. Berryhill*, 2019 WL 4164759, at *6 (D. Conn. Sept. 3, 2019) (remanding for further development of the record and additional

---

alleviate her symptoms, *id.* at 450, 455, and that her activities of daily living, *id.* at 262—68, 328, 429, 461, 602, were inconsistent with the level of pain alleged. *Id.* at 672—73.

assessment where the record failed to contain formal physician opinion and "progress notes [did] not contain assessments of the scope of [Claimant's] work-related capabilities or limitations"). Unlike the data in *Mirna C.* and in *Alamo*, the medical records in this case include not only diagnosis and treatment information, but also multiple assessments of Ms. M.'s functional capabilities, including those of her treating rheumatologist.

### 2. Substantial Evidence, Generally

The court concludes that substantial record evidence supports the ALJ's RFC determination. With respect to Ms. M.'s physical limitations, it shows that despite her periodically-tender trigger points, Tr. at 441, 583, tenderness, *id.* at 448—49, and complaints of pain in her hands, knees, feet, and lower back, together with her fatigue, Dr. Tallman's Assessments, *id.* at 348, 387; Ms. M.'s Testimony, *id.* at 47, 700, Ms. M. regularly presented to her treating rheumatologist with normal ranges of motion and with strength in her extremities. Dr. Tallman's Assessments, Tr. at 349-50, 388, 416, 596. Examinations of her joints, bones, and muscles routinely were normal. *Id.* at 341, 583, 606, 615. Despite one occasion on which she exhibited a "wide-gait," *id.* at 606, medical records show that her gait generally was normal. *Id.* at 341, 378, 488, 497. The record also contains indications that Prednisone helped to alleviate her symptoms. Dr. Tallman's Assessments, Tr. at 450, 455. June 2014 records regarding her bariatric surgery indicate that Ms. M. reported "parking farther away, using [an] exercise bike 5 min. per day" and her expressed interest in walking up to two times per day for thirty minutes each, and riding an exercise bike for thirty minutes per day. Tr. at 602. Ms. M. further indicated that she could drive a vehicle, regularly go out to eat, read books, watch television, and regularly attend church . . . ." *Id.* at 262—68. She did not have difficulty with personal

care, *id.* at Tr. at 263, reported continuing to look for work, *id.* at 328, 429, and indicated that she was considering getting a part-time job while awaiting SSI benefits, *id.* at 461.

With respect to Ms. M.'s mental capabilities, the ALJ limited her to "perform[ing] simple, routine tasks" with only "occasional contact with supervisors and coworkers, and incidental contact with the public." *Id.* at 667.  The ALJ recognized Ms. M.'s depression, anxiety, and hospitalization*, id.* at 669—70, but also highlighted additional records during the period in question during which she had been "doing well" and when her treatment had been alleviating her symptoms, *id.* at 329, 428, 431.  Indeed, while her depression and anxiety continued, she was cooperative, "motivated to perform up to her potential[,]" had good eye contact, but was "somewhat anxious[,]" *id.* at 333, and appeared "calm, pleasant, [and] appropriate", *id.* at 432.  Although she exhibited a level of anxiety, Ms. M. understood and followed test instructions and was able to concentrate with "no distractibility" and "no motoric overactivity." *Id.* at 333.  She was "relaxed" and "cooperative[,]" *id.* at 509, with normal behavior and logical, rational thought, *id.* at 360, 428—29, 431, "good insight and judgment," *id.* at 435, and normal intellectual functioning and memory, *id.* at 366, 509.  Medical records also support the ALJ's observations that Ms. M. frequently appeared friendly/pleasant and engaged, *id.* at 360, 571, 577, that she displayed a normal affect with appropriate grooming, *id.* at 340, 388, 441, 446, 577, 587, that she had no difficulties understanding and following instructions, that she exhibited good attention and concentration, *id.* at 333, and also that she addressed her symptoms with medication and therapy, *id.* at 328—31, 508.  While she reported anger issues and violence toward her partner, *id.* at 510, 513, Ms. M. also acknowledged that she lived alone, that she had friends, that she wanted to meet new people, and that she had been

looking for work, *id.* at 329—330, 511-12.  As noted, she additionally reported walking for exercise, attending church, and reading.  *Id.* at 510, 512.  In light of these findings and statements, together with the entire record in this case, the court concludes that substantial evidence supports the ALJ's RFC with respect to Ms. M.'s mental capacity to engage in "simple, routine tasks . . . [and to] have occasional contact with supervisors and co-workers, and incidental contact with the public."  *Id.* at 667.

The court further concludes that the ALJ thoroughly reviewed the record and that his decision fully articulates the reasons for his findings and conclusions.  Despite Plaintiff's view of the evidence, the "[p]resence of alternative interpretations of the record evidence does not require reversal of the ALJ's decision."  *Kelly v. Berryhill*, 2017 WL 1332716, at *11 (D. Conn. May 22, 2017) (remanded on other grounds) (citing *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.")).  The record contains ample medical findings regarding Claimant's normal joint strength, mobility, and upper and lower body strength, as well as assessments of her mental functioning and capabilities, including Ms. M.'s own reports of her activities.  In light of these records, and the great deference afforded the ALJ's findings pursuant to the applicable burden of proof, the conclusion that Ms. M. maintained an RFC for light work (within the stated limitations) is supported by substantial evidence and is inconsistent with a finding of disability for the period in question.  The court finds insufficient cause to disturb the ALJ's findings.

### 3. *Inconsistency*

Plaintiff next argues that the ALJ's RFC of light work with a limitation of only "occasional balancing"[22] is "internally inconsistent."  ECF No. 20 at 6—7.  According to Plaintiff, the ability to balance is required in order to stand and to walk, and thus to satisfy an RFC that is required to perform the prescribed range of light work.  *Id.*[23]

"In the [Selected Characteristics of Occupations "SCO"], 'balancing' means maintaining body equilibrium to prevent falling when walking, standing, crouching, or running *on narrow, slippery, or erratically moving surfaces.*" SSR 96-9p (emphasis added); *see Luke R. v. Comm'r of Soc. Sec.*, 2022 WL 14854421, at *6, n.4 (W.D.N.Y. Oct. 26, 2022).  By its terms, the definition of balancing appears to apply to circumstances in which the individual is exposed to the specifically-enumerated volatile surfaces. However, Plaintiff cites the SSR's clarification that, in the context of sedentary work,

> If an individual is limited in balancing only on narrow, slippery, or erratically moving surfaces, this would not, by itself, result in a significant erosion of the unskilled sedentary occupational base. However, if an individual is limited in balancing even when standing or walking on level terrain, there may be a significant erosion of the unskilled sedentary occupational base.

SSR 96-9p.

---

[22] SSR 83-10, provides that "'[o]ccasionally' means occurring from very little up to one-third of the time." *Titles II & XVI: Determining Capability to Do Other Work-the Med.-Vocational Rules of Appendix 2*, SSR 83-10 at *5 (S.S.A. 1983).

[23] Ms. M. attaches a decision of the Social Security Administration Appeals Council in another case that was remanded for "'articulat[ion] [of] what is meant by limited balancing in order to determine the erosion of the occupational base.'" *Id.* at 9 (quoting Appeals Council Decision, ECF No. 20-1).  However, the court notes that in that case, the claimant's RFC was limited to "never balancing" and the Appeals Council found additional articulation necessary for proper consideration of Plaintiff's RFC.  ECF No. 20-1 at 1—2.  As noted infra, however, there is insufficient evidence that Ms. M. exhibited balance issues on level ground, and, therefore this Appeals Council decision, and other applicable caselaw, do not require further articulation by the ALJ.  *See infra* at 27—28.

Plaintiff is correct that each of the jobs identified by the vocational expert require standing and walking.  Specifically, subassembler,[24] office cleaner,[25] and price marker[26] are quantified as light work which "requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."  *Titles II & XVI: Determining Capability to Do Other Work-the Med.-Vocational Rules of Appendix 2*, SSR 83-10 at *6.  The ALJ's decision does not specify the surfaces to which the balance limitation applies.  However, as the Commissioner notes, "Plaintiff does not argue, and the record does not suggest, that [Ms. M.] was, in fact, limited in walking on level terrain.  To the contrary, Plaintiff did not require a cane or other assistive device, walked for exercise, and routinely appeared with a normal gait (Tr. 268, 277, 341, 345, 378, 381, 602)."  ECF No. 23- at 11.  Other than one occasion on which notes indicate she presented with a "wide gait," Tr. at 606, Plaintiff has not cited any medical records to support a conclusion that she had any problem balancing on level surfaces.  Plaintiff's assumption that the ALJ's limitation applies to all surfaces lacks support in the medical record.  In light of the lack of medical evidence as to any balance issues on level ground, the lack of any argument that Ms. M. was so limited, and the impairments noted by the ALJ, a limitation on Ms. M.'s ability to balance only could apply to balancing on the aforementioned "narrow, slippery, or erratically moving surfaces" noted in SSR 96-9p, based on the facts and evidence presented in this case.  Therefore, on the facts and evidence presented here, the RCF is not rendered inconsistent, nor is the occupational base eroded simply because the ALJ

---

[24] 729.684-054 Subassembler, DICOT 729.684-054, 1991 WL 679729.
[25] 323.687-014 Cleaner, Housekeeping, DICOT 323.687-014, 1991 WL 672783.
[26] 209.587-034 Marker, DICOT 209.587-034, 1991 WL 671802.

did not specifically state that the limitation of occasional balancing only applied to such limited surfaces.[27]   This does not present a case of an "internal conflict" necessitating remand for further explanation of the ALJ's rationale.   *Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87, 92 (2d Cir. 2019) (recognizing that Commissioner must "'obtain a reasonable explanation' for any '*apparent*'—even if non-obvious—conflict between the *Dictionary* and a vocational expert's testimony.").

### B.    Step Five: Jobs Identified by Vocational Expert, and Ms. M.'s IQ

According to Plaintiff, "Ms. M.'s aptitude for general learning ability, as evinced by her IQ score, is in the lowest 10 percent and, therefore, is inconsistent with the Department of Labor's ("DOL") ratings for the jobs relied upon by the ALJ."   ECF No. 20 at 11.   Additionally, Plaintiff cites the opinion of Barbara McKim, Ph.D., a licensed psychologist who states that "the Full Scale IQ score is apt to be most closely commensurate with general learning ability . . . ."   ECF No. 26 at 8 (citing Tr. at 898). Based solely on Ms. M.'s IQ, Plaintiff avers that the DOL analysis puts her in a category of general learning ability below that required to perform the three jobs identified by the vocational expert: sub-assembler of electronics; office cleaner; and price marker.   ECF No. 20 at 11.   Plaintiff cites error in the ALJ's failure to discuss Ms. M.'s IQ in relation to these particular jobs.   ECF No. 26 at 9.

---

[27] *But see Luke R. v. Comm'r of Soc. Sec.*, 2022 WL 14854421, at *6 (W.D.N.Y. Oct. 26, 2022) (remanding where there was evidence of the claimant's balance issues that were "not adequately addressed by the ALJ, and there was no discussion in the RFC analysis regarding what is meant by limited balancing and the impact of balancing limitations on the remaining occupational base."); *Ramos v. Astrue*, 2010 WL 2854450, at *4 (W.D.N.Y. July 19, 2010) (remanding where there was evidence of the claimant's balance issues, "[t]he ALJ failed to explain whether the balancing limitations applied on "narrow, slippery, and erratically moving surfaces" or on level terrain[,]" and "[t]his distinction was pertinent in determining Plaintiff's RFC and in presenting a factually accurate hypothetical to the vocational expert (VE).").

Defendant notes in opposition that "IQ scores must also be considered in tandem with adaptive functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05."  ECF No. 23-1 at 7, n.6.  Defendant further states that "Plaintiff's argument relies entirely on her counsel's reading and interpretation of a resource that is not in the record, was not before the ALJ, and about which the vocational expert was not asked even though Plaintiff was represented at the administrative hearing (Tr. 725-730)."  *Id.* at 7—8.  Finally, the Commissioner notes that Ms. M.'s IQ score is not determinative here in light of her past skilled work and "[e]ven if Plaintiff's IQ may have changed somewhat between 1986 (score of 85, Tr. 316) and 2012, this is accounted for by limiting her to simple, unskilled work and further supported by the evidence of record."  *Id.* at 8, 9.  The court agrees.

In *Lawler v. Astrue*, 512 F. App'x 108  (2d Cir. 2013), the Second Circuit, addressing whether the claimant's condition satisfied a listing at step two, concluded that regardless of the validity of the claimant's IQ scores, the record contained substantial evidence in support of the ALJ's finding.  *Id.* at 111.  Similarly, in *Burnette v. Colvin*, 564 F. App'x 605 (2d Cir. 2014), the Second Circuit held that despite her low IQ score, the ALJ properly weighed the evidence of record and the claimant's education (graduated high school and attended college).  *Id.* at 608.  The *Burnette* court cited cases recognizing that an ALJ may "'reject an IQ score as invalid when it is inconsistent with the record,'" *id.* (quoting *Baszto v. Astrue,* 700 F. Supp. 2d 242, 248 (N.D.N.Y.2010)), and "may consider other record evidence to determine whether a reported IQ score was [an] 'accurate reflection of [claimant's] intellectual capabilities.'"  *Id.* (quoting *Lax v. Astrue,* 489 F.3d 1080, 1087 (10th Cir.2007)); *see also Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 32 (2d Cir. 2013) (finding remand for additional intelligence testing was not warranted and

noting "to the extent that the record supported a finding that Tankisi faced cognitive limitations, those limitations were incorporated into the assessment of Tankisi's RFC: the ALJ found that Tankisi could not "perform[ ] work that ... require[d] complex or detailed instructions.").

In his decision, the ALJ specifically addressed Ms. M.'s IQ of 78, "indicating borderline-to-low average intelligence."  Tr. at 670.  Additionally, Ms. M. testified that her mental symptoms and anxiety were the result of a past attempted attack by a customer at her former job.  *Id.* at 710.  However, as the ALJ recognized, medical records indicate that she did not have any difficulty "understanding and following the test instructions" and her "attention and concentration were good, and sustained," with "no distractibility."  Dr. Chappelle's Assessment, *id.* at 333.  Also, she was able to drive a car, was continuing to look for work, paid bills, and utilized bank accounts.  February 6, 2014 Self-Assessment, *id.* at 265; October 12, 2013 Self-Assessment, *id.* at 294.  Further, as the Appeals Council noted, "the examiner who performed [Ms. M.'s] IQ testing did not diagnosis [sic] [her] with borderline intellectual functioning or another cognitive disorder."  *Id.* at 638.  Considering the entire record, including Ms. M.'s past skilled work and her medically-documented mental functional abilities, the ALJ's decision (limiting her to simple, unskilled work and relying on the vocational expert's testimony that she maintained the ability to perform the stated unskilled jobs) is supported by substantial evidence, despite her IQ score. *Crawford v. Astrue*, 2014 WL 4829544, at *24 (W.D.N.Y. Sept. 29, 2014) (stating that "[n]othing in the record suggests that [plaintiff] is unable to perform unskilled work," where there was evidence of record that she "maintained employment in several semi-skilled positions . . . [,] manage[d] her own finances and enjoy[ed] reading . . . ." and that she

sought ongoing treatment for depression and PTSD and medication managed her symptoms). Ms. M.'s IQ was but one indicator of her decline in mental functioning that the ALJ considered in determining her RFC and in formulating the resulting hypothetical that was posed to the vocational expert. The court finds no error in the ALJ's failure to find Ms. M.'s IQ as determinative of her intellectual capabilities.

## IV.    CONCLUSION

In the instant case, Plaintiff asserts error based on improper reliance on state agency consultants, an internally inconsistent RFC, and the failure to properly consider Ms. M.'s IQ with respect to jobs she was able to perform.

Upon careful review, the court concludes that the ALJ was presented with an adequate record upon which to base his findings and conclusions, and that Plaintiff has not met his extraordinarily high burden of convincing this court that the facts here warrant either remand or reversal.

Accordingly, it hereby is **ORDERED AND ADJUDGED** as follows:

1.    The Motion to Reverse the Decision of the Commissioner, ECF No. 20, is **DENIED;**

2.    The Motion to Affirm the Decision of the Commissioner, ECF No. 23, is **GRANTED;**

3.    The Motion for Case Status, ECF No. 28, is **DENIED AS MOOT;** and

4.    The court respectfully requests that the Clerk of Court render judgment in Defendant's favor and close this case. Further, the Clerk is instructed that any related social security appeal that is returned to this district shall be assigned to the undersigned (as the District Judge who issued the present ruling).

**IT IS SO ORDERED** at Hartford, Connecticut, this 1st day of May, 2023.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE